**United States District Court**
**Northern District of Texas**
**Dallas Division**

| | |
|---|---|
| Eddie Patent Holdings LLC, Giddy Holdings, Inc., and Brett Jacobson, <br><br> *Plaintiffs* <br><br> v. <br><br> Callan JMB, Inc., Coldchain Technology Services, LLC, Monarch Property Management, LLC, Wayne D. Williams, Donna Williams, Liberty Smith Duke, Revival Health Inc., and James J. Chao, MD, <br><br> *Defendants* | Case No. _____ |

## Plaintiffs' Original Complaint

Plaintiffs Eddie Patent Holdings LLC ("Eddie"), Giddy Holdings, Inc. ("Giddy"), and Brett Jacobson file this Complaint against Defendants Callan JMB, Inc. ("CJMB"), Coldchain Technology Services, LLC ("Coldchain"), Monarch Property Management, LLC ("Monarch"), Wayne D. Williams, Donna Williams, Liberty Smith Duke, Revival Health Inc. ("Revival"), and James J. Chao, MD, alleging federal claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and state-law claims for fraud, negligent misrepresentation, promissory estoppel, quantum meruit, and civil conspiracy.

## STATEMENT OF THE CASE

This case concerns a coordinated scheme to defraud Plaintiffs, who believed they had found ideal partners that seemed to address their every need—and had the money to fund them. But to access them, Plaintiffs had to meet imminent deadlines, incur immediate obligations, and accept vague explanations. But due to repeated reassurances, Plaintiffs had no qualms with moving quickly to secure what seemed to be a legitimate, profitable opportunity.

Without explanation, communications slowed, then eventually ceased—only for Plaintiffs to receive a blunt, total repudiation of the deal. In truth, the forthcoming investment reserves were neither untouched nor freely deployable. They had instead been earmarked for other acquisitions and capital projects, including a separate Alabama real estate venture structured through undisclosed insider-owned entities to obtain state-based tax incentives. While Plaintiffs were demanded to ship inventory and finalize agreements, Defendants engaged in a pattern of escalating misrepresentation to obfuscate the object of their unlawful enterprise: to promise the same financing sources to multiple parties to pursue Project Summit and related incentives.

Plaintiffs performed, incurred substantial legal fees, and forewent a concrete multimillion-dollar investment opportunity. By this suit, Plaintiffs seek to hold Defendants accountable.

## PARTIES

1.      Plaintiff Eddie is a Texas limited liability company with its principal place of business in Dallas County, Texas.

2.      Plaintiff Giddy is a Delaware corporation with its principal place of business in Dallas County, Texas.

3.      Plaintiff Brett Jacobson is an individual residing in Dallas County, Texas.

4.      Defendant CJMB is a Nevada corporation with its principal place of business at 244 Flightline Dr., Spring Branch, Texas 78070.

5.      Defendant Coldchain is a Texas limited liability company and subsidiary of CJMB, with its principal place of business also at 244 Flightline Dr., Spring Branch, Texas 78070.

6.    Defendant Monarch (formerly known as "Judson College Properties, LLC") is an Alabama limited liability company with its principal place of business at 76 Calendula St., Spring Branch, Texas 78070.

7.    Defendants Wayne D. Williams and Donna Williams reside at 76 Calendula St., Spring Branch, Texas 78070.

8.    On information and belief, Defendant Liberty Smith Duke resides in Chilton County, Alabama.

9.    Defendant Revival is a Delaware corporation with its principal place of business at 1601 N. Sepulveda Blvd., Pmb. #103, Manhattan Beach, California 90266.

10.    On information and belief, Defendant Dr. James J. Chao resides in San Diego County, California.

## JURISDICTION

11.    Per 28 U.S.C. §§ 1331 and 1338, the Court has federal question jurisdiction over this suit because it includes a claim arising under RICO, 18 U.S.C. §§ 1961–1968. This Court has supplemental jurisdiction over the remaining claims under 15 U.S.C. § 1119 and 28 U.S.C. § 1367.

12.    The Court has personal jurisdiction over Defendants CJMB, Coldchain, and Monarch because their principal places of business are all in Texas. The Court also has personal jurisdiction over Defendants Wayne and Donna Williams because they are domiciled in Texas. The foregoing Defendants can be served within the territorial limits of Texas.

13.    The Court has personal jurisdiction over Defendants Liberty Duke, Revival, and Dr. Chao because they regularly transacted business underlying Plaintiffs' claims in Texas, purposefully conducted and directed certain representations to Plaintiffs in Texas, and thereby caused foreseeable injury to Plaintiffs in Texas.

## VENUE

14.    Under 28 U.S.C. §§ 1391(b)(1), (b)(2), and (c), venue is proper in this District because Defendants CJMB, Coldchain, Monarch, Mr. Williams, and Ms. Williams are domiciled in

this District, all Defendants are subject to personal jurisdiction in this District, and a substantial part of the relevant events giving rise to this Complaint occurred within this District.

## BACKGROUND

**1.    Eddie, the developer of a pioneering sexual health device, sought to expand its market to United States veterans and service members.**

15.    Plaintiffs developed and commercialized a patented, wearable FDA Class II medical device designed to address erectile dysfunction ("ED") without the use of prescription medications. The device is manufactured from medical-grade materials and is intended to provide a non-pharmaceutical option for men experiencing ED. Eddie owns all intellectual property associated with the Eddie product line. Giddy licenses the distribution rights to the product line from Eddie and is responsible for commercialization, storage, assembly, fulfillment, and distribution operations.

16.    Plaintiffs pursued expansion of their device within federal healthcare systems serving active-duty service members and veterans, including the Department of Veterans Affairs (the "VA") and the Department of Defense ("DoD"). Prior to engaging Defendants, Plaintiffs had already secured federal contracting vehicles, which permitted product access within the federal system but required incremental, facility-by-facility adoption. Plaintiffs sought to accelerate and scale distribution through integration with an established prime contractor, which would allow broader, top-down allocation of the product across federal networks on a materially faster timeline.

17.    Although Plaintiffs had secured federal contracting vehicles permitting product access within the VA and DoD systems, materially expanding distribution through prime-level integration would ordinarily require navigating a lengthy and competitive federal procurement process, often exceeding a year, and demonstrating past performance, infrastructure, and scale comparable to incumbent prime contractors. As a practical matter, meaningful "top-down" expansion was most efficiently attainable through alignment with an established prime contractor possessing existing federal relationships, contracting authority, and demonstrated performance.

18.     Securing or expanding prime-level federal contracting authority involves a complex, highly regulated procurement process governed by the Federal Acquisition Regulation ("FAR") and agency-specific requirements. Prospective prime contractors must demonstrate established past performance, operational scale, supply-chain capacity, pricing structures, compliance protocols, and the administrative infrastructure necessary to service multiple federal facilities. The process is competitive, documentation-intensive, and typically unfolds over an extended period of time. As a result, absent partnership with an incumbent prime contractor already possessing such status and relationships, accelerated system-wide integration is not readily achievable.

19.     Federal agencies routinely favor incumbent prime contractors with demonstrated past performance, established compliance systems, and existing agency relationships. Entities without prior prime-contracting history face significant competitive disadvantages in attempting to secure comparable status, particularly where large-scale, multi-facility distribution is contemplated. As a practical matter, pursuing prime-level authority independently is typically a prolonged and resource-intensive undertaking, frequently requiring extensive preparation, documentation, negotiations, and agency review over an extended period before any award is made.

20.     In light of these structural barriers, suppliers seeking to scale distribution within federally administered healthcare systems often pursue strategic alignment with established prime contractors in order to accelerate access and avoid the extended timeline, expense, and uncertainty associated with independently securing prime-level authority. Absent such a partnership, Plaintiffs continued pursuing a "bottom-up" expansion strategy, leveraging their existing federal contracting vehicles to drive facility-level adoption within the VA and DoD systems while incrementally building the operational footprint necessary for broader integration.

21.     Expanded integration within the VA and DoD systems would have materially increased Plaintiffs' enterprise value and strengthened ongoing capital discussions. Plaintiffs' rapid commercial growth in a large and underserved segment of the men's health market had already attracted interest from sophisticated, institutional investors. Broader federal adoption, particularly through prime-level integration, would have provided immediate, scalable revenue

validation and objective performance benchmarks, significantly enhancing valuation metrics used in capital raises and strategic transactions.  At the time of these discussions, Plaintiffs were actively engaged in a capital raise and had received investment from investors for a substantial portion of the round. Defendants were informed that Plaintiffs' decisions regarding alternative financing would be directly impacted by the availability of the promised $25 million investment and federal rollout.

**2.    Dr. Chao, a Revival principal, offered Plaintiffs the opportunity to sell their devices through CJMB, an established prime contractor and a Revival partner.**

22.    On December 5, 2025, in Dallas, Texas, Mr. Jacobson met with Dr. James Chao (a co-founder and Revival executive) and his son, Connor Chao. Dr. Chao was in Dallas visiting Connor, an SMU student, and joined Mr. Jacobson and a mutual acquaintance for dinner. During that meeting, Dr. Chao represented that Revival maintained a close strategic relationship with CJMB, and that CJMB possessed established federal prime-contractor access within the VA system. Dr. Chao told Mr. Jacobson about Revival's successful multistate distribution of Medicare-covered GLP-1 drugs. Dr. Chao attributed this success to Revival's partnership with CJMB, a supplier and logistical solutions provider for healthcare-related goods and services. Specifically, CJMB—via its subsidiary Coldchain Technology Services, LLC ("Coldchain")— has served as a prime contractor for the VA and the DoD for over a decade.

23.    Importantly, Dr. Chao represented to Mr. Jacobson that Revival could facilitate Plaintiffs' rollout with these departments via CJMB's prime-contracting relationships. Plaintiffs would accordingly have "top-down" access to VA and DoD marketplaces. To that end, Dr. Chao promised to introduce Mr. Jacobson to Wayne Williams, CJMB and Coldchain's CEO, chairman, and founder.

**3.    Dr. Chao coordinates a call with himself, Mr. Jacobson, and Mr. Williams.**

24.    Dr. Chao facilitated an introductory phone call among himself, Mr. Jacobson, and Mr. Williams, which occurred on December 19, 2025.

25.     There, Mr. Williams—on behalf of CJMB—represented that he could secure prime-level access for Plaintiffs through CJMB's existing federal relationships. Mr. Williams confirmed that CJMB could facilitate accelerated, system-wide rollout of the Eddie device within federally administered marketplaces and represented that such access was not otherwise readily available to Plaintiffs through their existing contracting vehicles.

26.     Mr. Williams further emphasized that time was of the essence. He stated that Plaintiffs and CJMB would need to agree upon and execute the material terms of the transaction before a January 2026 contracting window closed. According to Mr. Williams, failure to finalize the arrangement before that deadline would result in Plaintiffs being excluded from prime-level integration opportunities for the remainder of the year. These representations created urgency and were presented as a limited-time opportunity requiring immediate action.

**4.     Mr. Jacobson, along with an Eddie investor, then met with CJMB's and Revival's principals to solidify deal terms.**

27.     Believing time was limited, Mr. Jacobson agreed to meet with Williams and Dr. Chao soon after. Dr. Chao facilitated an in-person meeting among Mr. Jacobson Mr. Williams, Donna Williams (Mr. Williams's spouse and CJMB's Director of Operations), Elliot Zemel (on behalf of an Eddie investor group), Ryan Richardson (Plaintiffs' Regional Government Sales Director), and Connor.

28.     On December 29, 2025, these individuals met in San Antonio, Texas, for nearly 8 hours.

29.     During that meeting, Mr. Williams described CJMB's deteriorating financial and market position following its decision to go public. He stated that the timing of CJMB's public listing "couldn't have been worse," explaining that changes in federal vaccine programs had materially reduced CJMB's primary revenue niche. He complained that CJMB's stock price had fallen significantly and that CJMB was under public-market pressure. He further referenced CJMB board member Eric Kash as having advised and assisted him in connection with taking the company public.

30.    Mr. Williams then described a redevelopment initiative involving the former Judson College campus in Marion, Alabama (the "Judson Property"). He stated that the college had closed during the COVID-19 period but had undergone substantial renovation prior to closing, and that the State of Alabama was offering significant economic incentives tied to capital investment and job creation. Mr. Williams described the initiative, referred to as "Project Summit," as a major strategic opportunity for CJMB involving pharmaceutical logistics, research, and related operations. He represented that CJMB intended to utilize facilities at the property for vaccine-related research and distribution, including potential equine facilities and leased laboratory space, and that additional facilities could be used for affiliated operations. Mr. Williams stated that the project required approximately $5 million in near-term funding.

31.    Mr. Williams asked whether Plaintiffs, Mr. Zemel's investor group, or Plaintiffs' principals would provide the approximately $5 million needed for Project Summit through an investment or loan. Mr. Jacobson responded that Plaintiffs could not provide that financing. Although the parties briefly discussed whether Mr. Jacobson could facilitate introductions to potential financing sources, no agreement was reached regarding any third-party funding for Project Summit.

32.    Mr. Williams rejected the need for third-party capital and stated that he would instead fund the transaction through CJMB's Equity Line of Credit (the "ELOC"). He proposed that CJMB would invest $25 million into Eddie Patent Holdings LLC, rather than $20 million, but only if Plaintiffs agreed to acquire the Judson Property as part of the overall transaction. Mr. Williams represented that approximately $5 million of the total economic arrangement would be allocated toward acquisition and redevelopment of the Judson Property.

33.    Mr. Jacobson expressed concern that equity-line financing often carries restrictions, trading limitations, and market-based conditions that could impair CJMB's ability to deliver a $25 million lump-sum investment on a compressed timeline. In response, Mr. Williams represented unequivocally that CJMB had not materially drawn upon the ELOC, that the full $25 million was available, and that he could access and deploy the funds at his sole discretion without

restrictions, encumbrances, or limitations. Mr. Williams represented that the funds were immediately available and sufficient to close the contemplated transaction.

34.     Dr. Chao reinforced Mr. Williams's funding assurances. In response to Mr. Jacobson's continued concern regarding timing and certainty of ELOC funding, Dr. Chao represented that Revival would provide a $25 million bridge loan if CJMB's ELOC funding did not materialize on the required timeline. Dr. Chao stated, in substance, that Revival would extend such bridge financing for whatever duration was necessary to allow the transaction to close.

35.     Based on these representations, Mr. Williams and Mr. Jacobson agreed in principle to material terms including: (a) a $25 million investment by CJMB into Eddie Patent Holdings LLC funded through the ELOC; (b) issuance of 250 units to CJMB pursuant to the same investor documentation used for other investors in the round; (c) a 6.25% royalty on product revenue payable monthly, with escalating guaranteed minimum royalties; (d) CJMB's appointment as prime vendor for VA and DoD distribution and provider of related fulfillment services; and (e) Plaintiffs' acquisition of the Judson Property, with approximately $5 million allocated within the overall economic structure toward that acquisition and related improvements.

36.     During the meeting, Mr. Williams expressly advised Plaintiffs not to proceed with a previously discussed $20 million investment from Elliot Zemel and the investor group he represented. Mr. Williams stated that CJMB's proposed $25 million investment would replace the need for that financing and that CJMB would be a superior strategic partner because it could purportedly deliver accelerated federal integration through its claimed prime-contracting relationships.

37.     Mr. Williams repeatedly emphasized that the transaction needed to be documented and executed on an emergency timeline. He stated that the parties needed to sign no later than January 5, 2026 in order to preserve access to a purported January 26, 2026 federal contracting window and that failure to close by that date would foreclose prime-level integration opportunities for the year. He presented this deadline as non-negotiable and demanded immediate action over the New Year's holiday.

38.     The compressed timeline and referenced "January 26, 2026" contracting window were presented as a non-negotiable drop-dead deadline to force Plaintiffs' immediate performance and expenditures. Defendants' later repudiation, coupled with Defendants' admissions that the ELOC was already earmarked for other projects, demonstrates that the purported urgency was not a good-faith contracting constraint, but a pressure tactic used to induce reliance and extract near-term value for Defendants' other objectives.

39.     At the conclusion of the meeting, after the agreed terms were restated, Mr. Williams stood, walked to Mr. Jacobson, and shook his hand, stating words to the effect of "we have a deal." Donna Williams instructed Mr. Williams to shake Mr. Jacobson's hand again and stated, in substance, that Mr. Jacobson was now "family" and how eager she was to meet Mr. Jacobson's fiancé and Ryan Richardson's wife.

40.     After leaving CJMB's offices, Mr. Jacobson traveled toward the airport with Dr. Chao and Connor Chao. During that drive, Dr. Chao reiterated that Mr. Williams could be trusted and reaffirmed that the transaction would close. Dr. Chao again stated that Revival would backstop the funding if CJMB could not promptly deliver the ELOC proceeds.

41.     In reliance on these representations, Plaintiffs understood that CJMB had both the present financial capacity and the committed strategic intent to invest $25 million, that the funding was not contingent upon additional approvals or market conditions, and that Revival would ensure completion of the transaction if necessary.

42.     Plaintiffs would not have proceeded on Defendants' emergency timeline, incurred the associated legal expense, or foregone alternative financing absent Dr. Chao's repeated assurances that Revival would provide a $25,000,000 bridge loan if CJMB could not timely access the ELOC proceeds. Defendants made these assurances to eliminate Plaintiffs' stated concerns about ELOC uncertainty and to induce Plaintiffs' immediate reliance and performance.

43.     Plaintiffs further understood that time was of the essence and that immediate preparation of definitive agreements was required in order to meet the January 5 execution deadline and preserve the purported January 26 federal contracting opportunity described by Mr. Williams.

**5.    Mr. Williams connects Mr. Jacobson to Liberty Duke, a director on CJMB's board.**

44.    Ms. Duke was appointed as a director of CJMB effective February 4, 2025. She has worked with CJMB and its affiliates since at least 2023 in connection with healthcare and immunization initiatives. Ms. Duke also serves as president of ERIS, Inc., through which she provides management, consulting, and lobbying services, including lobbying activities within the Alabama legislature. Upon information and belief, Ms. Duke played a central role in advancing Project Summit within the State of Alabama.[1]

45.    On December 30, 2025, Mr. Williams sent an email to Mr. Jacobson and Ms. Duke. There, Mr. Williams asked Ms. Duke to "send him everything on Judson," and repeated the terms of the arrangement— "once we lock down the ELOC with Giddy, he will fund the Judson project through our Judson Coll[e]ge [P]roperties LLC . . . ."

**Figure 1: Mr. Williams's Dec. 30, 2025 Email**

On Tue, Dec 30, 2025, 4:37 PM Wayne Williams <WWilliams@coldchain-tech.com> wrote:

> Hello Liberty.
>
> I am using the email to do a informal introduction to Brett Jacobson, CEO of Giddy. As we discussed he put a big smile on Donna and my face yesterday as we discussed our companies tackling everything with the Eddie device. Can you do me a big favor, can you please send him everything on Judson. As discussed, once we lock down the ELOC with Giddy, he will fund the Judson project through our Judson Collage properties LLC and we can get that moving.
>
> Brett, Liberty is one of my most competent business partners and will be key with everything we do. She is also just like you and me, straight shooter and will not sugar coat anything.
>
> Thanks guys and looking forward to the relationship.
>
> Best, Wayne

---

[1]    Former Alabama Senator Gerald Dial was also appointed to the CJMB board on February 4, 2025.

46.    That same day, Ms. Duke responded with her acknowledgement, and told Mr. Jacobson to "stand by for documents," and proceeded to transmit materials related to the Judson Property and Project Summit.

47.    Ms. Duke then sent Mr. Jacobson the October 21, 2025 "Project Summit Joint Offer"[2] from "the State of Alabama, the City of Marion, and Perry County."

48.    The joint proposal was addressed to "CallanJMB," contrary to what Mr. Williams's had previously represented about CJMB's purported non-involvement with Project Summit:

**Figure 2: Excerpt from Project Summit Joint Offer**



OFFICE OF THE GOVERNOR
KAY IVEY
GOVERNOR

STATE OF ALABAMA

DEPARTMENT OF COMMERCE
ELLEN MCNAIR
SECRETARY OF COMMERCE

October 21, 2025

**Project Summit Joint Offer**

The State of Alabama, the City of Marion and Perry County are offering a joint proposal to CallanJMB to assist in the location of Project Summit in Perry County, Alabama. We hope this proposal indicates our desire to continue our corporate-community partnership. Our incentives in this proposal are designed to assist Project Summit with the expenses of building a facility, obtaining equipment, recruiting and training a skilled workforce, and reducing the operational costs of payroll, property taxes and Alabama income taxes.

Below is a summary of the incentives our state and local team puts forth for the location of this project in Alabama.

49.    The Joint Offer includes a letter from the Alabama Secretary of Commerce, addressed to Mr. Williams's Coldchain email address. The letter similarly references "CallanJMB" and relays the understanding "that Project Summit will see an investment of $24,500,000"—which coincided with CJMB's $25 million ELOC amount considering closing costs:

---

[2]    Attached as Ex. 1, Project Summit Joint Offer.

**Figure 3: Excerpt from Secretary of Commerce Letter to Mr. Williams**

_VIA EMAIL WWilliams@coldchain-tech.com_
Wayne Williams, President
244 Flightline Drive
Spring Branch, TX 78070

Dear Mr. Williams:

I am pleased to learn that CallanJMB is considering locating its facility in Marion, Alabama at the former Judson College campus. It is my understanding that Project Summit will see an investment of $24,500,000 and will create 51 new full-time positions with an average hourly wage of $39.54, exclusive of benefits. The State has worked in conjunction with the local officials to develop a proposal that we believe will meet the project needs to locate your Center of Excellence in Alabama.

50.    Ms. Duke sent a December 5, 2025 agreement between the "State of Alabama and Coldchain Technology Services, LLC" (the "Project Summit Agreement").[3] The agreement also contemplates "a total Capital Investment" of $24.5 million:

**Figure 4: Excerpt of Project Summit Agreement**

**WHEREAS**, the Company wishes to purchase and equip an existing facility located at 302 Bibb Street in Marion, Perry County, Alabama (the "Facility"), wherein the Company will establish a Center of Excellence that includes a cutting-edge national and international medical and technical research, development, initial product production and global logistics hub focused on the pharmaceutical and technology industries (the "Project"), and the Company is expected to create at least fifty-one (51) new Full-Time Employee positions, earning an average hourly wage of at least Thirty-Nine Dollars and Fifty-Four Cents ($39.54), exclusive of Fringe Benefits, with a total Capital Investment in the Project estimated to be Twenty-Four Million Five Hundred Thousand Dollars ($24,500,000);

51.    The Project Summit Agreement confirms CJMB's (and Coldchain's) goal to establish a "Center of Excellence" for pharmaceutical and technology research and development, production, and "global logistics hub."

52.    The Project Summit Agreement expressly states, "in reliance on the Company's representations of the Capital Investment, employment and wage levels, and the undertaking of

---

[3]    Attached as Ex. 2, Project Summit Agreement.

the Project," the Alabama government committed to providing "certain incentives," which were estimated to total $10,257,176.

53.     The Project Summit Agreement also includes a Project Schedule:

**Figure 5: Project Summit Agreement Schedule**

> **EXHIBIT A**
> **COLDCHAIN TECHNOLOGY SERVICES, LLC**
> **PROJECT SUMMIT**
> **PROJECT SCHEDULE**
>
> **1.   PROJECT TARGET DATES:**
>
> | | | |
> |---|---|---|
> | a. | Commencement of Construction: | January 15, 2026 |
> | b. | Commencement of Operations: | May 01, 2026 |
> | c. | Capital Investment Target Date: | March 01, 2026 |
> | d. | Jobs Target Date: | December 31, 2027 |
>
> **2.   DEADLINE TO START FIRST REPORTING YEAR:**
>
> | | | |
> |---|---|---|
> | a. | Investment Credit: | April 1, 2026 |
> | b. | Jobs Credit: | April 1, 2028 |

54.     Per the schedule, construction would commence on January 15, 2026. The target date for the capital investment is March 1, 2026.

**6.     Upon Mr. Williams's express demands, Plaintiffs shipped from overseas 500,000 units of inventory to CJMB.**

55.     On December 30, per Mr. Williams's express authorization and direction (and before any documents were executed), Mr. Williams requested 10 pallets of product (equivalent to 1 million units of Plaintiffs' device) shipped to CJMB, who Mr. Williams claimed could handle all of Plaintiffs' packaging needs. Not only was this request a sizable task, it required Plaintiffs to coordinate overseas shipment from Singapore.

56.     When Mr. Jacobson asked how CJMB intended to pay for these units, Mr. Williams said, "Don't worry about pricing," and "We'll match whatever you need." Mr. Jacobson accordingly complied and took steps to reroute the inventory from Singapore to CJMB. However, Mr.

Williams never followed through with his promise to pay for the units. Fortunately, Plaintiffs were able to reroute the delivery again to another packer, but incurred substantial costs to effect the initial change.

**7.    At a CJMB board call, Plaintiffs were subjected to unexpected hostility from certain board members.**

57.    On December 31, 2025, Mr. Jacobson participated in a telephonic CJMB board meeting. In attendance were Mr. Williams and various other CJMB board members: Christopher Shields, Mark Meller, and Eric Kash. Dr. Chao was also present, along with David Porzio (managing director of a New York-based investment fund), an associate of CJMB's outside counsel; and a corporate attorney for Plaintiffs. Ms. Duke did not attend.

58.    Based on Mr. Williams's prior representations and repeated assurances that the transaction was board-aligned and fully vetted, Mr. Jacobson reasonably believed the board had already evaluated and approved the agreed-upon terms. Instead, when Mr. Williams presented the transaction and described the projected revenue, guaranteed minimum royalties, and the anticipated federal integration, certain board members reacted with overt hostility. Mr. Kash demeaned Plaintiffs' business and product using coarse and reductionist language, belittling both the device and the sexual health industry generally. He questioned the legitimacy and scalability of Plaintiffs' operations and attacked Mr. Jacobson personally. Mr. Meller similarly disparaged the company, characterizing the transaction as a distraction and a "waste of time."

59.    During the call, Mr. Meller and Mr. Kash referenced alternative strategic plans for CJMB, including the acquisition or partial acquisition of certain distribution clients as part of an "on-shoring" initiative. Those acquisitions, according to the discussion, would also be funded through CJMB's ELOC, constituting a third contemplated use of the same financing source that Mr. Williams had represented was fully available for Plaintiffs' transaction and for Project Summit.

60.    Mr. Williams openly argued with Mr. Meller and Mr. Kash during the call. He stated that their alternative plans would not generate meaningful revenue in 2026 and asserted that the Eddie transaction was a "no-brainer" that would produce immediate guaranteed royalty

revenue and solve CJMB's top-line and profitability concerns. Mr. Williams stated he intended to move forward with the transaction despite their objections.

61.    The call ended without a formal vote or clear confirmation of board authorization. The unexpected hostility and references to alternative ELOC uses caused Mr. Jacobson to question whether the board had, in fact, approved the transaction and whether Mr. Williams had accurately represented CJMB's authority and financial capacity.

**8.    Mr. Williams's calls Mr. Jacobson after the board call to apologize and reaffirm CJMB's commitment to continue moving forward.**

62.    Later that day, Mr. Williams had a one-on-one call with Mr. Jacobson, apologizing for Mr. Kash's hostility and reiterating CJMB's commitment to the January 26 deadline. Calling the deal a "Mr. Williams stated that his attorney, Ross, had reviewed the transaction and described it as "a gift from God" that needed to be signed immediately. Mr. Williams emphasized that the agreements had to be finalized and executed no later than January 5, 2026, before he departed for Asia with Dr. Chao and Mr. Fujioka. He further stated that funding needed to be secured before that trip in order for the deal to move forward on schedule. Mr. Jacobson responded that he would work with counsel to transmit execution-ready agreements as quickly as possible.

63.    During that same call, Mr. Williams stated that he had informed Mr. Kash that he was fired from the board. Mr. Williams then asked Mr. Jacobson whether he would be willing to join the CJMB board in Mr. Kash's place. Mr. Jacobson agreed in principle. When asked what compensation he would expect, Mr. Jacobson stated that he would require only a modest travel allowance if in-person attendance were necessary. Mr. Williams represented that Mr. Kash had been receiving approximately $200,000 per year in board compensation and characterized him as disloyal and self-interested.

64.    Mr. Williams also pressed Mr. Jacobson to authorize an immediate public announcement regarding Plaintiffs' partnership with CJMB and the anticipated funding of Project Summit, even though no funds had yet been delivered. Mr. Jacobson refused, stating that no announcement could be made until the agreements were executed and funding was secured. Mr.

Williams responded that accessing the full $25 million through the ELOC might take several weeks. Mr. Jacobson stated that, if so, Revival would need to bridge the funding to allow the transaction to close and any announcement to proceed responsibly. Mr. Williams indicated that a bridge might take several days and suggested that a partial funding could support an announcement.

65.     During this discussion, Mr. Jacobson also raised concerns regarding the significant legal costs required to prepare definitive agreements on an emergency basis over the New Year's holiday. He explained that completing the documentation under the compressed timeline would likely cost several hundred thousand dollars. Mr. Williams nevertheless insisted that the documents needed to be prepared immediately and reiterated that the transaction was board-approved and required urgent execution. In reliance on those representations, Mr. Jacobson authorized approximately $200,000 in legal expenditures to finalize the agreements on an expedited basis.

66.     Mr. Jacobson further expressed ongoing confusion and concern regarding the structure of the Judson Property acquisition, including whether Giddy would ultimately transfer the property to CJMB or Coldchain, how ownership would be structured, and the potential conflicts of interest inherent in requiring Plaintiffs to fund an asset that appeared to benefit insiders. Mr. Williams dismissed these concerns and assured Mr. Jacobson that the structure was board-approved and would be handled through a separate entity, Judson College Properties, LLC (the "Judson LLC").

67.     On the afternoon of December 31, 2025, Mr. Williams sent Mr. Jacobson an email with the subject line "The entity that will own Judson," attaching documentation identifying the ownership and formation details of the Judson LLC.

68.     The attached documentation revealed that the members of the Judson LLC were Donna Williams, Liberty Duke, Dr. James Chao, and Wayne Williams. The listed company address corresponded to the Williamses' personal residence. This disclosure contradicted prior representations minimizing Mr. Williams's involvement in the real estate transaction and portraying the structure as separate from CJMB's internal interests.

**Figure 6: Member Information for the Judson LLC**



69.     The documentation further revealed that Ms. Duke, then a CJMB board member, and Dr. Chao, who had represented that Revival would guarantee a $25 million bridge, were both members of the Judson LLC. Mr. Jacobson noted that this ownership structure materially conflicted with prior representations that the Judson acquisition would be separate from CJMB's corporate affairs and free of insider conflicts.

70.     Mr. Jacobson also found it problematic that the individuals listed as members of the Judson LLC did not align with the representations made to Alabama governmental authorities in connection with Project Summit, where CJMB and Coldchain were presented as the operating entities. The involvement of privately held insider-owned affiliates, including non-CJMB members

such as Donna Williams and Dr. Chao, further reinforced Mr. Jacobson's concerns regarding conflicts of interest, self-dealing, and the use of affiliated entities to structure the transaction.

**9.    Plaintiffs circulated execution-ready agreements the next day.**

71.    Per Mr. Williams's repeated instructions that the transaction be executed no later than January 5, 2026, Mr. Jacobson transmitted final execution-ready versions of the draft agreements on January 1, 2026. Before doing so, Mr. Jacobson expressly raised concerns regarding the substantial legal expense required to prepare complex investment, royalty, prime-vendor, fulfillment, and real-estate-related agreements on an emergency basis over the New Year's holiday. Mr. Williams nevertheless insisted that the documents needed to be completed immediately, reiterating that the deal was board-approved, that time was of the essence, and that execution prior to his departure overseas was critical. In reliance on those representations, Mr. Jacobson authorized approximately $200,000 in legal expenditures to prepare and finalize the agreements on an expedited basis.

72.    Each of the draft agreements reflected the material terms previously agreed upon and contemplated an effective date of January 5, 2026, consistent with Mr. Williams's stated deadline. The agreements incorporated the $25 million ELOC investment into Eddie Patent Holdings LLC, the issuance of 250 units to CJMB, the 6.25% royalty with escalating annual guaranteed minimums, the prime vendor and fulfillment arrangements, and the allocation structure related to the Judson Property.

73.    To minimize risk and address Mr. Jacobson's previously expressed concerns regarding conflicts of interest and structural ambiguity surrounding the Judson Property, the proposed real estate documentation expressly conditioned Giddy's acquisition of the property on CJMB's prior funding of the full $25 million investment through its ELOC. The drafts further preserved Giddy's discretion to structure any property transaction in a manner that minimized Plaintiffs' exposure to liability and financial risk. No obligation to acquire or fund the Judson Property would arise absent CJMB's completed capitalization.

**10.    Despite Plaintiffs' timeliness, neither Mr. Williams nor any other CJMB member responded meaningfully, and the January 5 deadline lapsed.**

74.    Upon transmitting the execution-ready agreements on January 1, 2026, Mr. Jacobson requested confirmation of receipt and next steps. Mr. Williams did not respond until the following day and, when he did, stated only that he was reviewing the documents with counsel and would reconnect the following week. No revisions, execution instructions, or funding confirmations were provided.

75.    The urgency Mr. Williams had previously imposed, insisting the agreements be executed by January 5 before his departure overseas, abruptly dissipated. Mr. Jacobson was concerned by the shift in tone but continued to expect execution prior to the January 5 deadline that Mr. Williams himself had characterized as critical.

76.    During this interim period, Mr. Williams continued to communicate about peripheral matters. He texted Mr. Jacobson regarding a purported VA contact who was "excited" about Plaintiffs' device and requested that product samples be sent immediately. Relying on the still-pending transaction and the expectation of imminent federal rollout, Mr. Jacobson arranged for overnight delivery of product samples valued at more than $10,000. Those samples were never paid for.

77.    January 5, 2026 passed without execution of the agreements, without funding, and without any meaningful communication from Mr. Williams or CJMB. No explanation was provided for the failure to meet the deadline Mr. Williams had repeatedly described as essential.

78.    On January 8, 2026, Mr. Jacobson finally spoke with Mr. Williams by telephone. Despite previously representing that he would review and respond to the agreements, Mr. Williams did not provide substantive feedback, proposed revisions, or a timeline for execution. Instead, the discussion was limited largely to general operational matters concerning potential VA opportunities.

79.    During that call, Mr. Williams referenced a vague "issue" with the ELOC but declined to provide specifics. This was the first time Mr. Williams suggested any limitation or

complication concerning access to the $25 million he had previously represented was fully available, unrestricted, and within his sole discretion. He stated that he needed to further discuss the matter with counsel, but no such follow-up call was ever scheduled.

80.    Mr. Jacobson again raised concerns regarding potential commingling, insider conflicts, and the structure of the Judson Property acquisition and Project Summit. Mr. Williams denied any impropriety and represented that legal counsel had approved the structure. Mr. Williams further stated that he had wired deposits to secure the Judson acquisition, despite the previously agreed structure in which Giddy's acquisition was expressly conditioned on CJMB's prior funding of the $25 million investment.

81.    Because Mr. Williams provided no clarity regarding funding or execution, Mr. Jacobson sought confirmation directly from Revival. Dr. Chao arranged a call with Mr. Fujioka. During that call, Mr. Fujioka expressed unfamiliarity with the details of the transaction and did not confirm that Revival would guarantee a $25 million bridge loan. He did not affirm prior representations that Revival would backstop CJMB's funding. The call ended without confirmation of Revival's participation or support.

## 11.    After Mr. Jacobson sent a letter to CJMB seeking clarity, Mr. Williams represents that the deal was not possible.

82.    On January 9, 2026, after repeated attempts to obtain confirmation regarding execution and funding, Mr. Jacobson sent an email to Mr. Williams and other CJMB board members attaching a formal written memorialization of the parties' discussions, communications, and actions to date concerning the proposed $25 million investment, the royalty structure, the prime-vendor arrangements, and the Judson Property transaction. The correspondence sought direct confirmation of CJMB's intent and present ability to fund and close the transaction.

83.    Later that day, Mr. Williams responded in writing that, after discussions with counsel and other board members, he had realized "that this 25-million-dollar investment is not feasible currently. Most of the ELOC was originally earmarked for capital expenses and acquisitions that were already presented to investors and the board."

84.    Defendants controlled information flow among CJMB's directors and participants concerning the transaction and its sudden repudiation. For example, when Plaintiffs sought clarification from director Liberty Duke immediately after Mr. Williams's repudiation email, Ms. Duke stated she had been removed from the email thread and was unaware of the termination communication, further evidencing Defendants' concealment and internal coordination surrounding the misrepresentations and reversal.

85.    Mr. Williams further stated, "This would have been a major shift and would not allow me to acquire the companies that we have identified. I know this is not what was anticipated from our discussions." This representation directly contradicted Mr. Williams's prior repeated assurances that (i) the ELOC was fully accessible and within his sole discretion to draw, (ii) no material restrictions or prior commitments limited its availability, (iii) no prior draws had materially reduced available capital, and (iv) the $25 million investment could be funded immediately in order to meet the January 5 execution deadline and January 26 contracting window.

## 12.    Confused by CJMB's sudden rejection, Mr. Jacobson calls Ms. Duke for an explanation.

86.    On the evening of January 9, 2026, confused by the abrupt repudiation of the transaction, Mr. Jacobson called Ms. Liberty Duke to seek clarification. Ms. Duke had not participated in the December 31 board call and had not been included in Mr. Williams's written rejection of the deal.

87.    During that call, Ms. Duke represented that she was unaware of any formal board vote rejecting the transaction and had not been informed that the deal had been terminated. When Mr. Jacobson recounted the board call and subsequent communications, Ms. Duke spoke critically of fellow board member Eric Kash. She advised Mr. Jacobson to "run from any discussion with Eric," attacked his competence by calling him "a walking idiot," and further stated, "you can't trust a pork-eating Jew." Ms. Duke stated she had not been informed of Mr. Kash's alleged firing but said she would have celebrated his removal.

88.    Ms. Duke further advised Mr. Jacobson to "run from this right now," expressing doubt as to how "the whole investment into CJMB, vice versa, would behoove you." She then disclosed for the first time that CJMB's ELOC was subject to what she described as a "7x derivative," which effectively imposed a substantial financial penalty when funds were drawn. She stated that when CJMB withdrew "a million or two million dollars, we had an $800,000 penalty or whatever this derivative is." Mr. Jacobson had never previously been informed of any derivative structure, penalty mechanism, or draw restriction affecting the ELOC.

89.    Ms. Duke also admitted that she was the individual who brought the Judson Property and Project Summit opportunity to CJMB. She further acknowledged that the original purpose of the ELOC was to fund mergers and acquisitions, stating in substance, "the original purpose of the ELOC was for us to do these M&As." She questioned why CJMB would "free up our ELOC to buy your company when we should be using our ELOC to buy Judson." When Mr. Jacobson explained that Mr. Williams had represented the ELOC would not be used to purchase Judson directly but instead that Judson would be acquired through a separate entity, Ms. Duke did not reconcile the inconsistency and stated only that she "can't even pull the 3.6 I need to secure Judson that I have 16 million in incentives on."

90.    When Mr. Jacobson raised concerns regarding potential conflicts of interest and fiduciary obligations, particularly given CJMB's status as a public company, Ms. Duke described what she characterized as common internal practices. She stated that the Williams family personally owned warehouses from which CJMB and Coldchain operated and leased those properties back to the company. She further commented that "we can't get Wayne's kids out of the mix," suggesting additional family involvement in company-affiliated transactions. When Mr. Jacobson asked who ultimately controlled decisions at CJMB and Coldchain, whether Wayne Williams or Donna Williams, Ms. Duke responded: "Donna. Make no mistake, Donna."

91.    Ms. Duke then suggested that the transaction could potentially proceed at a reduced level, stating that perhaps "a million dollars" would be sufficient rather than the previously

promised $25 million investment. She proposed scheduling another meeting among CJMB, Revival, and Plaintiffs to explore a revised structure. No such meeting was ever convened.

**13.    On January 15, 2026, CJMB announced a strategic teaming agreement with Attune Biotech Inc., and CJMB's stocks soar.**

92.    On January 15, 2026, less than one week after representing to Plaintiffs that the $25 million investment was "not feasible", CJMB issued a public press release announcing a strategic teaming agreement with Biostax Corp. d/b/a Attune Biotech Inc. ("Attune"), which it described as a "clinical-stage biopharmaceutical company with a diversified therapeutic pipeline." The release stated that CJMB would serve as an "independent third-party overseer of Attune's manufacturing, quality assurance and control, and deployment operations." The announcement highlighted CJMB's "federal contract experience," including "DoD/VA pharmaceutical services," and emphasized its "cold chain infrastructure" as a mechanism to accelerate Attune's "path to federal deployment."

93.    Upon information and belief, Attune's public-facing website was updated or launched in its current form on or about January 15, 2026, contemporaneously with CJMB's press release.

94.    Following the announcement, CJMB's publicly traded stock experienced a substantial increase in price and trading volume. On information and belief, the stock closed at approximately $1.12 on the trading day preceding the announcement and rose to approximately $4.20 following the release. The announcement was subsequently referenced by market commentators and financial tracking platforms.

**14.    Local Alabama news sources reported on CJMB's suspected involvement in the Judson Property based on Ms. Duke's involvement.**

95.    The Perry County Herald, an independent local news publication covering Perry County, Alabama, where the former Judson College campus is located, published an article on January 18, 2026 reporting on a network of transactions connected to redevelopment efforts at the

Judson Property. The article described the involvement of multiple entities and individuals associated with the proposed Project Summit initiative.

96.    The article identified Liberty Duke as "one of the key figures at the center of that network," describing her role as a Montgomery-based lobbyist and her participation in public meetings on January 5 and January 13, 2026, at which the Marion City Council and the Perry County Commission approved tax abatements for Judson College Properties, LLC. The article noted that, at the time of publication, no publicly searchable corporate registration records for Judson College Properties, LLC could be located in Alabama, Texas, or Delaware.

97.    The report further observed that little had been publicly disclosed about the ownership structure of the entity receiving the tax abatements. By referencing Ms. Duke's affiliation with CJMB while describing her involvement in the Judson redevelopment approvals, the article reflected public uncertainty regarding the relationship among CJMB, its directors, and the privately held entity seeking state and local incentives.

**15.    Two days later, the Judson LLC changed its name to "Monarch Property Management, LLC."**

98.    On January 20, 2026, Judson College Properties, LLC filed a Certificate of Amendment with the Alabama Secretary of State changing its name to "Monarch Property Management, LLC." The amendment was executed and filed by Liberty Duke.[4]

---

[4]    Attached as Ex. 3, Monarch Certificate of Amendment.

**Figure 7: Excerpt from Monarch's Certificate of Amendment**



99.    The filing appended the entity's original Certificate of Formation, which reflects that Judson College Properties, LLC was formed on January 7, 2026, two days after the January 5 execution deadline lapsed and within days of Mr. Williams's representations that deposits had been wired to secure the Judson Property. The Certificate of Formation identifies Wayne D. Williams as the organizer of the entity and lists 76 Calendula Street, Spring Branch, Texas 78070, Mr. Williams's personal residence, as the company's address.

**16.    Ms. Duke, at a subsequent Marion City Council meeting, excused the name change on vague compliance requirements and to distance it from Judson College.**

100.    On January 20, 2026, the same day the Certificate of Amendment was filed, Ms. Duke attended a Marion City Council meeting at which she discussed general plans for pharmaceutical logistics operations at the former Judson College campus, including proposed warehouse, distribution, and handling operations for "regulated pharmaceutical components."

101.    During that meeting, Ms. Duke stated that the entity's name change from Judson College Properties, LLC to Monarch Property Management, LLC was intended to distance the redevelopment project from the defunct Judson College and to comply with state guidance associated with the requested tax abatements.

102.    Council members and members of the public, including Judson College alumni, requested additional details regarding the ownership structure, future use of the campus, and the

scope of redevelopment plans. Ms. Duke responded that she and Monarch were subject to a non-disclosure agreement and declined to provide further specifics.

**17.    Ms. Duke's most recent disclosures to the Alabama Ethics Commission do not include her involvement with Monarch.**

103.    On January 23, 2026, Ms. Duke filed a Lobbyist Registration Statement with the Alabama Ethics Commission for the 2026 reporting year.[5] In that filing, she identified Coldchain Technology Services, LLC as a represented entity. The filing does not list CJMB, Judson College Properties, LLC, or Monarch Property Management, LLC as represented clients.

104.    Likewise, in Ms. Duke's Quarterly Statement of Lobbying Activities dated January 19, 2026,[6] covering the reporting period of October through December 2025, she identified Coldchain but did not disclose representation of CJMB, Judson College Properties, LLC, or Monarch Property Management, LLC.

**18.    Public government databases indicate CJMB never held federal prime contracts, and Coldchain's prior prime contracts were limited to packaging.**

105.    Publicly accessible federal contracting databases, including USAspending.gov and related government procurement records, indicate that Callan JMB, Inc. (CJMB) has not held any federal prime contracts.

106.    Those same databases reflect that Coldchain Technology Services, LLC has been associated with approximately 122 federal contract awards, the majority of which were issued by the Department of Defense. Only one identified award involved the Department of Veterans Affairs, and that contract terminated in or around 2015.

107.    The available contract descriptions indicate that Coldchain's federal awards primarily involved packaging-related services and materials. None of the identified awards reflect

---

[5]    Attached as Ex. 4, Ms. Duke's Lobbyist Registration Statement.
[6]    Attached as Ex. 5, Ms. Duke's Quarterly Statement of Lobbying Activities.

prime contracts for the distribution of medical devices or pharmaceutical products comparable to the federal rollout represented to Plaintiffs.

108. Based on publicly reported obligation data, the average federal contract obligation amount associated with Coldchain's prior awards is approximately $42,000.

109. The most recent reported Coldchain federal contract terminated on or about October 22, 2025. As of that date, publicly available records do not reflect any active federal prime contracts held by CJMB or Coldchain.

**19.    A CJMB-filed SEC statement indicates it drew from its ELOC on August 7, 2025.**

110. On October 3, 2025, approximately two months before representing to Plaintiffs that the ELOC was fully accessible and unused, CJMB filed a Schedule 14C Information Statement with the U.S. Securities and Exchange Commission. In that filing, CJMB disclosed that it had issued a purchase notice to Hexstone Capital, LLC for approximately $550,000 in exchange for 123,208 shares of common stock, pursuant to its Equity Line of Credit agreement.

111. The Schedule 14C further disclosed material restrictions governing the ELOC, including the following:

> Hexstone will not be required to buy any shares of Common Stock on any trading day on which the closing price of the Common Stock is below $1.00. The net proceeds under the ELOC Purchase Agreement to us will depend on the frequency and prices at which we sell shares to Hexstone. We expect that any proceeds received by us from such sales to Hexstone will be used to support our operations, for working capital and for other general corporate purposes."

The filing thus reflects that access to ELOC proceeds was dependent upon stock price and market conditions and was not automatically or unconditionally available in lump-sum amounts.

112. These public disclosures materially contradict Mr. Williams's prior representations to Mr. Jacobson that (i) the ELOC was untouched, (ii) no prior draws had been taken, (iii) no restrictions or parameters limited access, and (iv) the full $25 million could be readily accessed at his

sole discretion in order to meet the January 5 execution deadline and January 26 contracting window.

## CAUSES OF ACTION

**Count 1:       Violations of 18 U.S.C. §§ 1962(c), (d) (Civil RICO) (against all Defendants)**

113.     Plaintiffs incorporate by reference the preceding and following paragraphs.

114.     Defendants include individuals and entities organized under their respective states (*i.e.*, Texas, Nevada, Alabama, and Delaware), and thus are "persons" as defined in 18 U.S.C. § 1961(3).

115.     At all relevant times, Defendants formed an association-in-fact enterprise (the "Enterprise"), as the term is defined in 18 U.S.C. § 1961(4).

116.     The Enterprise operated through CJMB's corporate structure and affiliated insider-owned entities to obtain money, inventory, services, government incentives, and strategic positioning through misrepresentations concerning financing capacity and federal contracting capability.

117.     The Enterprise affected interstate commerce by engaging in multi-state communications, international and interstate shipment of goods, securities transactions, and federal contracting representations.

118.     In violation of 18 U.S.C. § 1962(c), Defendants conducted the Enterprise's affairs through a "pattern of racketeering" activity, as defined in 18 U.S.C. § 1961(5). This pattern consists of wire fraud in violation of 18 U.S.C. § 1343 and other qualifying predicate acts, including the instruction for Plaintiffs to ship their goods internationally prior to funding, based on fraudulent representations of a deal that would have involved a $25 million investment into Plaintiffs; Plaintiffs' interstate communications (including those with Ms. Duke in Alabama and Revival principals in California) that induced Plaintiffs' performance; Defendants' conspiracy to misrepresent to Alabama government authorities the extent of their respective involvement in Project Summit and their ability to invest $24.5 million therein; and the failure of Ms. Duke to disclose to the Alabama

Ethics Commission her conflicts of interest stemming from her involvement in Project Summit and Monarch.

119. The racketeering acts were related because each depended on misrepresenting financing capacity. Defendants made similar misrepresentations about their ability to fund investments to Plaintiffs, the State of Alabama, and Attune. Beyond Defendants' intent to obtain incentives in Alabama, Defendants also intend to use Project Summit and its partnership with Attune and Revival to secure prime contracts with the DoD and the VA—prime contracts Defendants had previously led Plaintiffs to believe they could readily obtain, but they were in fact contingent upon defrauding Plaintiffs into purchasing the Judson Property and funding Project Summit.

120. Based on the foregoing and subsequently described activity, numerous individuals and entities, including Plaintiffs, have been injured by Defendants' misconduct.

121. There is a specific threat of repetition of Defendants' misconduct extending indefinitely into the future.

122. There is no reason to suppose Defendants' misconduct will not continue but for Plaintiffs' filing of this lawsuit, including this civil RICO violation against Defendants.

123. Defendants, their employees, and their agents each agreed to commit, participate and/or conduct at least two of the predicate acts described above, in violation of 18 U.S.C. § 1962(c). Defendants therefore violated 18 U.S.C. § 1962(d).

124. At all relevant times, Defendants have engaged in, and their activities affect, interstate commerce, as Defendants conduct their services in and among Texas, Alabama, California, and elsewhere in the United States, including both interstate and international channels of commerce used in Defendants' buying, selling, and transporting goods and services per state and federal contracts.

125. Defendants are liable, jointly and severally, to Plaintiffs for an amount equal to threefold their sustained damages and costs of suit, including but not limited to reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

**Count 2:        Common-Law Fraud (against CJMB, Coldchain, the Williamses, Revival, and Dr. Chao)**

126.    Plaintiffs incorporate by reference the preceding and following paragraphs.

127.    Defendants made material misrepresentations of fact (or made false promises to perform), including by and through the misrepresentations of at least the Williamses, Coldchain, Dr. Chao, and Revival: that CJMB had the ability, intent, and authority to invest up to $25,000,000 in Giddy; that CJMB had not prior accessed funds through its ELOC and could access ELOC funds without restriction; that January 26, 2026, was a non-negotiable deadline requiring immediate action; that the Judson Property acquisition would be performed by Giddy; that CJMB or Coldchain had the ability, intent, and authority to secure federal prime contracts on behalf of (or for the benefit of) Plaintiffs; and that Revival could fund $25,000,000 as a bridge loan if CJMB could not pay.

128.    Defendants knew the statements were false when made (or were made with reckless regard of their truthfulness), as shown by their concealment of restrictions and conditions on CJMB's ELOC; that CJMB had prior drawn around $500,000 from their ELOC; that Plaintiffs have not discovered the significance of January 26, 2026, to any official deadlines to secure prime contracts; that Mr. Williams paid the deposit for the Judson Property despite the expectation that Giddy would do so; that neither CJMB nor Coldchain had no current prime contracts, and that its prior prime contracts were significantly smaller in scope than the proposed arrangement and contemplated performance unrelated to medical devices; Mr. Fujioka's lack of knowledge and approval over the circumstances of the deal and the bridge loan; that the ELOC funds were previously earmarked for other projects; and Ms. Duke's admissions.

129.    Defendants, with intent to deceive or defraud (or with disregard for the truth), conducted the fraudulent acts that are the basis of this action.

130.    Plaintiffs justifiably relied on Defendants' misrepresentations, false promises, and/or omissions to their detriment.

131.    Plaintiffs' injuries include reliance costs, including Plaintiffs' delivery of nearly $1,000,000-worth of devices delivered via international channels, and subsequent deliveries of free

samples, which were never repaid; loss of an investment opportunity of at least $20,000,000, whose investor now refuses to work with Plaintiffs due to Defendants' deception; lost enterprise value from delayed commercialization and channel disruption, including lost opportunity costs in Plaintiffs' decision to not seek prime contracts itself; and nearly $100,000 in legal fees and expenses incurred in the preparation of the draft agreements that Defendants demanded be delivered in a compressed timeframe.

132.    Plaintiffs' injuries resulted from Defendants' actual fraud, which entitles Plaintiffs to exemplary damages under TEX. CIV. PRAC. & REM. CODE § 41.003(a).

**Count 3:    Negligent Misrepresentation (against CJMB, Coldchain, the Williamses, Revival, and Dr. Chao)**

133.    Plaintiffs incorporate by reference the preceding and following paragraphs.

134.    Defendants did not use reasonable care in obtaining or communicating the false representations or promises as described in the foregoing allegations.

135.    Plaintiffs actually and justifiably relied on Defendants' representation, which proximately caused Plaintiffs' injuries, as alleged in the preceding paragraphs.

136.    Plaintiffs' injuries resulted from Defendants' gross negligence, which entitles plaintiff to exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003(a)(3).

**Count 4:    Promissory Estoppel (against CJMB, Coldchain, the Williamses, Revival, and Dr. Chao)**

137.    Plaintiffs incorporate by reference the preceding and following paragraphs.

138.    Defendants made express promises to invest in Plaintiffs, and accordingly induced Plaintiffs to perform, as more specifically described in the prior paragraphs.

139.    Plaintiffs reasonably and foreseeably relied to their detriment.

140.    Injustice can be avoided only by enforcement via the damages suffered by Plaintiffs' reliance on Defendant's promises.

**Count 5:      Quantum Meruit (against CJMB, Coldchain, the Williamses, Revival, and Dr. Chao)**

141.    Plaintiffs incorporate by reference the preceding and following paragraphs.

142.    By Defendants' promises to perform, Plaintiffs conferred benefits upon Defendants, which they accepted, as described in the foregoing sections.

143.    Defendants failed to perform as promised.

144.    Injustice can be avoided only by enforcement via the damages suffered by Plaintiffs' reliance on Defendant's promises.

**Count 6:      Civil Conspiracy (against all Defendants)**

145.    Plaintiffs incorporate by reference the preceding and following paragraphs herein.

146.    At all relevant times, Defendants communicated, coordinated, and acted in concert concerning the proposed $25,000,000 investment into Plaintiffs; the acquisition and development of the Judson Property, per Project Summit; representations concerning CJMB's federal prime-contracting capabilities; and the availability and use of CJMB's ELOC financing.

147.    The object of the conspiracy was to induce Plaintiffs to rely on representations that CJMB had immediate and unrestricted access to $25,000,000; forgo alternative financing opportunities; ship inventory and product samples without secured payment; and lend legitimacy, credibility, and leverage to Defendants' Project Summit and related business initiatives.

148.    The conspiracy further sought to use Plaintiffs' anticipated partnership and projected revenue to enhance Defendants' strategic positioning with investors, government entities, and other third parties. Further, Defendants materially benefited from the public announcement of the Attune partnership, which triggered a stock spike that materially increased trading volume necessary to access the ELOC.

149.    A meeting of the minds may be inferred from Defendants' coordinated conduct, communications, and shared objectives.

150.    In furtherance of the conspiracy, Defendants committed overt acts including, but not limited to, the misconduct underlying the torts as described in the foregoing paragraphs.

151. As a direct and proximate result of the conspiracy, Plaintiffs suffered damages, for which Defendants are jointly and severally liable.

## DAMAGES

152. Plaintiffs incorporate by reference the preceding and following paragraphs.

153. Plaintiffs are entitled to recover at least actual damages, lost profits, consequential damages, reliance damages, attorneys' fees, pre-judgment and post-judgment interests, and court costs.

154. Plaintiffs are also entitled to recover their respective damages sustained, interest, attorneys' fees, and costs against Defendants, jointly and severally, under 18 U.S.C. § 1964.

## EXEMPLARY DAMAGES

155. Plaintiffs incorporate by reference the preceding and following paragraphs.

156. Pursuant to at least Tex. Civ. Prac. & Rem. Code § 41.003, Plaintiffs are entitled to exemplary damages because harm to them resulted from Defendants' fraud or malice.

157. Plaintiffs also demand punitive damages for Defendants' RICO violations.

## ATTORNEYS' FEES

158. Plaintiffs incorporate by reference the preceding and following paragraphs.

159. Pursuant to at least 18 U.S.C. § 1964(c), Plaintiffs are entitled to reasonable attorneys' fees.

## JURY DEMAND

160. Plaintiffs incorporate by reference the preceding and following paragraphs.

161. Plaintiffs request a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Plaintiffs pray that the Court enter judgment awarding them the following relief:

A.    Actual damages;

B.    Treble damages;

C.     Exemplary damages;

D.     Punitive damages;

E.     Attorneys' fees and expenses;

F.     Costs;

G.     Pre- and post-judgment interest; and

H.     All other relief to which Plaintiffs are entitled.

March 18, 2026                                              Respectfully submitted,

**GRIFFITH BARBEE PLLC**

/s/ *Casey Griffith*
_____

Casey Griffith
Texas Bar No. 24036687
Casey.Griffith@griffithbarbee.com

Joshua Yun
Texas Bar No. 24120335
Joshua.Yun@griffithbarbee.com

One Arts Plaza
1722 Routh St., Ste. 910
Dallas, Texas 75201
(214) 446-6020 | main
(214) 446-6021 | fax

**Counsel for Plaintiffs**