# Exhibit 2

**PROJECT AGREEMENT**

**BY AND BETWEEN**

**THE STATE OF ALABAMA**

**AND**

**COLDCHAIN TECHNOLOGY SERVICES, LLC**

**(PROJECT SUMMIT)**

# PROJECT AGREEMENT

**THIS PROJECT AGREEMENT** is made and entered into by and between the **STATE OF ALABAMA** and **COLDCHAIN TECHNOLOGY SERVICES, LLC**, a Texas limited liability company, effective as of the date on which all the Parties have signed this Agreement, including the Governor of the State of Alabama, who shall be the last signatory to sign.

# R E C I T A L S

**WHEREAS**, the Company wishes to purchase and equip an existing facility located at 302 Bibb Street in Marion, Perry County, Alabama (the "Facility"), wherein the Company will establish a Center of Excellence that includes a cutting-edge national and international medical and technical research, development, initial product production and global logistics hub focused on the pharmaceutical and technology industries (the "Project"), and the Company is expected to create at least fifty-one (51) new Full-Time Employee positions, earning an average hourly wage of at least Thirty-Nine Dollars and Fifty-Four Cents ($39.54), exclusive of Fringe Benefits, with a total Capital Investment in the Project estimated to be Twenty-Four Million Five Hundred Thousand Dollars ($24,500,000);

**WHEREAS**, the Alabama Jobs Act, as amended, is codified under section 40-18-370, *et seq.*, of the Code of Alabama and was passed by the Alabama Legislature for the purpose of fostering economic development and encouraging job creation within the State through the recruitment of quality projects and the expansion of existing businesses within the State;

**WHEREAS**, Perry County is a targeted county, as defined under section 40-18-376.1 of the Code of Alabama;

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

**WHEREAS,** the Secretary has found and certified to the Governor that the Project has a qualifying North American Industrial Classification System Code of 541614 (Process, Physical Distribution, and Logistics Consulting Services) and will employ at least ten (10) net new employees, and therefore meets the definition of a Qualifying Project pursuant to section 40-18-372 of the Code of Alabama;

**WHEREAS**, the Secretary has found that Perry County is a targeted county as of the Effective Date, the Project will increase the economic diversity of, or otherwise benefit, Perry County and will involve, either directly or indirectly, at least Two Million Dollars ($2,000,000.00) of capital, and therefore the Project meets the definition of a Qualifying Project pursuant to sections 40-18-372 and 40-18-376.1 of the Code of Alabama;

**WHEREAS,** the Secretary has recommended to the Governor that the Company be designated as an Approved Company;

**WHEREAS,** in reliance on the information provided by the Secretary, the Governor has made the necessary findings to designate the Project as a Qualifying Project and to designate the Company as an Approved Company;

**WHEREAS**, in reliance on the Company's representations of the Capital Investment, employment and wage levels, and the undertaking of the Project as described in this Agreement, and in consideration of the economic impact, increased tax revenues, and other benefits to be received by the State and its citizens, the State has committed to make available to the Company certain incentives in the manner and amounts described in this Agreement, subject to applicable State and Federal laws; and

**WHEREAS,** the Company attests that the incentive commitments provided for in this Agreement were a material factor in the consideration to undertake the Project.

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

**NOW, THEREFORE,** in consideration for the mutual promises and covenants contained in this Agreement and for other valuable consideration, the receipt, adequacy, and sufficiency of which is hereby acknowledged, the Parties enter into this Agreement on the following terms and conditions.

1. **Scope of Agreement.**  This Agreement fully sets out the complete agreement and supersedes all prior and collateral communications and agreements of the Parties relating to the subject matter of this Agreement. This Agreement includes the facts, averments, and representations set forth in the Recitals, as well as all exhibits, attachments, or appendices attached to or referenced in this Agreement, all of which are hereby incorporated by reference.

2. **Definitions.**  In addition to the definitions provided in the Alabama Jobs Act, for the purposes of this Agreement, the following terms shall have the meanings set forth in this Section:

   Actual Average Hourly Wage shall be computed by the following formula: [(Wages for all Project Employees in a Reporting Year) divided by (hours worked by all Project Employees in the same Reporting Year)].

   Adequate Health Insurance Coverage shall mean health insurance which provides, at a minimum, the following: hospital care, physician care, prenatal and postnatal care and prescription drugs; and for which the Company shall pay at least fifty percent (50.00%) of the Project Employee's insurance plan premium.

   Agreement shall mean this document and any other attached or referenced documents that are within the scope of agreement as established in Section 1 of this Agreement.

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

Capital Investment Target shall mean Twenty-Four Million Five Hundred Thousand Dollars ($24,500,000.00).

Capital Investment Target Date shall mean the date set forth in Subsection 1(c) of the Project Schedule.

Change of Control shall have the meaning of either:

i. The acquisition by any "Person" (as the term "person" is used for the purposes of Subsection 13(d) or 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) of direct or indirect beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of more than fifty percent (50.00%) of the combined voting power of the then-outstanding securities or membership interests of the Company entitled to vote in the election of directors or governing body, or

ii. The consummation of a merger, consolidation, reorganization, statutory share exchange, or similar form of corporate transaction involving the Company, or the sale or other disposition of all or substantially all of the Company's assets.

Commence Construction or Commencement of Construction shall mean physical work is being performed daily, using appropriate equipment and manpower to equip the Facility and install necessary infrastructure to accomplish the objectives of the Project.

Commence Operations or Commencement of Operations shall mean that the Company has established a Center of Excellence that includes a cutting-edge national and international medical and technical research, development, initial product production and global logistics hub focused on the pharmaceutical and technology industries at the Facility.

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

Commerce shall mean the Alabama Department of Commerce.

Company shall mean Coldchain Technology Services, LLC, a Texas limited liability company.

Effective Date shall mean the date on which all of the Parties have signed this Agreement.

Facility shall mean the existing facility to be purchased and equipped at 302 Bibb Street in Marion, Perry County, Alabama, as set forth in the Recitals of this Agreement.

Force Majeure Event shall mean a matter which is (i) beyond the reasonable control of the Company, (ii) materially affects the performance by the Company of its obligations under this Agreement and (iii) could not reasonably have been foreseen by the Company, including, but not limited to, acts of God, acts of terrorism, and extreme weather, but excluding unfavorable economic conditions.

Fringe Benefits shall mean all non-Wage consideration paid or otherwise provided to Project Employees, including, but not limited to, health and life insurance premiums, retirement planning services, and qualified retirement plans. Fringe Benefits must include Adequate Health Insurance Coverage as defined in this Agreement.

Full-Time Employee shall mean a person who is paid directly by the Company for not less than thirty-six (36) hours per week, is employed at the Facility, and who the Company identifies as its employee to the Alabama Department of Revenue or the Alabama Department of Workforce on returns or reports filed with the foregoing, including but not limited to, Form A-6, Form A-1,

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

Form W-2, UC-CR-4, and UC-10-R. Notwithstanding the foregoing, the definition of "Full-Time Employee" for purposes of this Agreement shall not include a temporary employee or a worker performing construction work on buildings or other structures which are intended to be part of the Project.

Governor shall mean the Governor of the State of Alabama.

Incentive Period shall mean the period during which the Company may claim Jobs Act Incentives. The Incentive Period may commence, at the Company's option, on a calendar quarter beginning on April 1, July 1, or October 1, on or after the Company employs at least the Minimum Jobs Threshold and the Project achieves the Minimum Capital Threshold, but it shall commence no later than the dates set forth in Subsections 2(a) and 2(b) of the Project Schedule. The Incentive Period shall end on the last day of the final Reporting Year that the Company is eligible to claim Jobs Act Incentives.

Indemnified Parties shall have the meaning set forth in Section 16 of this Agreement.

Investment Credit shall mean the annual tax credit under Subsection 4(a) of this Agreement.

Jobs Act Incentives shall mean, collectively, the Jobs Credit and Investment Credit.

Jobs Credit shall mean the annual cash refund under Subsection 4(b) of this Agreement.

Jobs Target shall mean fifty-one (51) Project Jobs.

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

Jobs Target Date shall mean the date set forth in Subsection 1(d) of the Project Schedule.

Maintenance Period shall mean the period of three (3) Reporting Years immediately following the last day of the Incentive Period.

Minimum Average Hourly Wage shall mean Thirty-Nine Dollars and Fifty-Four Cents ($39.54).

Minimum Capital Threshold shall mean, directly or indirectly, Two Million Dollars ($2,000,000) of capital.

Minimum Jobs Threshold shall mean forty-one (41) Project Jobs.

Parties shall mean the State and the Company collectively, each of which is a Party to this Agreement.

Placed-in-Service Date shall mean the date of issuance of a certificate of occupancy for the Facility by the City of Marion or any other governmental body with the jurisdiction and the authority to do so or, if no certificate of occupancy is required as to the Project, Commencement of Operations as defined in this Agreement.

Project shall have the meaning set forth in the Recitals of this Agreement.

Project Employee shall mean a Full-Time Employee occupying a Project Job. All Project Employees shall be eligible to receive any Fringe Benefit provided by his or her employer.

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

8

Project Job shall mean a net new Full-Time Employee position created during the Project Ramp-Up Period for the Project.

Project Ramp-Up Period shall mean the period of time beginning on the Effective Date and ending on the Jobs Target Date.

Project Schedule shall mean the schedule of dates set forth in Exhibit A of this Agreement, which schedule is hereby incorporated herein by reference. Any change to the Project Schedule occurring after the Effective Date shall require approval by the Secretary and the Company. Any such Project Schedule change shall be requested by the Company in writing and, if approved, shall be acknowledged in writing by the Company and the Secretary.

Recapture Base shall mean the aggregate amount of Jobs Act Incentives actually (i) received as refunds by the Company, and (ii) claimed by the Company as credits against any Alabama tax liability, and (iii) purchased and transferred by the Company as of a Recapture Year.

Recapture Year shall mean any Reporting Year during which the Company is in default during the Maintenance Period as described in Subsection 7 of this Agreement.

Reporting Year shall mean each 365-day period of the Incentive Period and the Maintenance Period.

Revenue shall mean the Alabama Department of Revenue.

Secretary shall mean the Secretary of Commerce of the State of Alabama.

State shall mean the State of Alabama.

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

9

Wages shall have the meaning as provided in section 40-18-370 of the Code of Alabama.  Wages shall not include Fringe Benefits.

Yearly Average shall mean the average number of Project Jobs calculated on an annual basis for each Reporting Year. The Yearly Average shall be calculated by adding the total number of Project Jobs on the 15th day of each month in the applicable Reporting Year and dividing that sum by twelve (12).

3. **The Company's Commitments, Representations and Warranties.** The Company acknowledges that the citizens of the State anticipate the prompt receipt of substantial economic benefit to the State and local communities in return for the incentives granted under this Agreement. In consideration of the State providing the incentives described in this Agreement, the Company makes the following commitments, representations, and warranties:

(a)     The Company shall cause Commencement of Construction not later than the date set forth in Subsection 1(a) of the Project Schedule, and the Company shall cause Commencement of Operations not later than the date set forth in Subsection 1(b) of the Project Schedule.

(b)     In furtherance of the Project, not later than the Capital Investment Target Date, the Company's total Capital Investment in the Project is estimated to be the Capital Investment Target.

(c)     Not later than the Jobs Target Date, the Company shall achieve the Jobs Target, wherein Project Employees earn an average hourly wage of at least the Minimum Average Hourly Wage.

(d)     The Company acknowledges and agrees that Fringe Benefits shall include

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

Adequate Health Insurance Coverage for all Project Employees.

(e)    The Company shall give good faith consideration to Alabama-based contractors and vendors and Alabama residents to provide products and services in undertaking the Project. The Company shall select contractors and vendors which are in good standing, licensed and qualified to do business in Alabama, all in accordance with Alabama law. The Parties acknowledge that selection of contractors and vendors for the Project shall be at the sole discretion of the Company.

(f)    The Company shall give good faith consideration to qualified Alabama residents for employment at the Project, subject in all cases to the Company's then usual and customary hiring policies.

(g)    The Company is a going concern, is financially solvent and shall make available adequate funding to undertake the Project and conduct the Company's business at the Facility.

(h)    The Company is in good standing, licensed and qualified to do business in Alabama, all in accordance with Alabama law, and shall remain licensed, qualified, in good standing and in compliance with all Alabama laws applicable to its operations at the Facility throughout the duration of this Agreement including any applicable employment and immigration laws.

(i)    Pursuant to section 31-13-9 of the Code of Alabama, by signing this Agreement, the Company affirms, for the duration of this Agreement, that it will not violate federal or state immigration law or knowingly employ, hire for employment, or continue to employ an unauthorized alien within the State. Furthermore, if the Company is found to be in violation of this provision, it shall be deemed in breach of this Agreement and the Company

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

shall be responsible for all damages resulting therefrom. On or before the Effective Date, the Company has provided to the State documentation evidencing its participation in the E-Verify program.

(j)     The Company is not prohibited from consummating the transaction contemplated in this Agreement by any law, regulation, agreement, instrument, restriction, order, or judgment.

(k)     The Company has the legal power and authority to enter into this Agreement and to make the respective commitments made in this Agreement. To the extent that (i) any authorization, approval, resolution or consent of the Company's board of directors, officers, managers, trustees or any other persons is required under either the Company's organizational or governing documents, or otherwise is required by law, and (ii) any authorization, approval or consent of any governmental authority, body, or agency or third party is required for the Company to enter into this Agreement and make the commitments contained in this Agreement, any such authorizations, approvals, and consents have been duly obtained in accordance with applicable law and procedures. Upon request by the State, reasonable documentation of the foregoing authority and action shall be provided by the Company. Further, upon request of the State, the Company shall provide such other documentation as is reasonably satisfactory to the State as to the matters described in this Agreement.

(l)     If the Company determines that it will not meet any of the commitments set forth in Subsections 3(a), (b) or (c) by the deadlines set forth in those subsections due to the occurrence of a Force Majeure Event, within a reasonable time prior to expiration of any such commitment that the Company claims has been or will be delayed by a Force Majeure Event, the Company shall give the State written notice containing a description of the

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

12

Force Majeure Event in question, an explanation of how the Company anticipates such event will affect the Company's performance under this Agreement, what actions the Company plans to undertake in order to address the conditions caused by the Force Majeure Event and an estimate of how long the Company anticipates the Force Majeure Event will delay the Company in meeting its commitments under this Agreement. If the State determines that a Force Majeure Event has occurred and that the Company is making a good faith effort to meet its commitments despite the delay caused by the Force Majeure Event, the State shall give the Company a reasonable period of time to address such conditions before the Company shall be considered in default under this Agreement.

(m)     The Company shall provide written notice to the State prior to any Change of Control, and provide any information or documentation requested by the State to evaluate the proposed Change of Control. Information or documentation provided by the Company regarding a proposed Change of Control shall be received by the Secretary in confidence and the Secretary shall take all reasonable measures necessary to prevent the disclosure of such confidential information. No Change of Control shall occur without the Company obtaining the Secretary's written consent, which shall not be unreasonably withheld.

4. **Commitments of the State.**   In consideration of the Company undertaking the Project and the economic benefit to the State and local communities to be realized from those operations, and subject to the provisions pursuant to section 40-18-370, *et seq.,* of the Code of Alabama, and all other applicable State laws, the State shall make available to the Company the Jobs Act Incentives as provided in Subsections 4(a), 4(b), and the AIDT commitment as provided in Subsection 4(c).

(a)     **Investment Credit.**   The Company shall be eligible to receive a tax credit

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

in the annual amount of one and one-half percent (1.50%) of its Capital Investment in the Project, not to exceed the Capital Investment Target, against Alabama income taxes or utility gross receipt taxes, or both, pursuant to sections 40-18-376 and 40-18-376.1(d) and in accordance with procedures established by Revenue. The Investment Credit shall be available for a period of ten (10) consecutive Reporting Years.

Any unused Investment Credit may be carried forward by the Company for up to five (5) years pursuant to section 40-18-376(b)(1)(a) of the Code of Alabama.

All or a portion of the first three (3) years of the Investment Credit may be transferred by the Company in the manner and as permitted under section 40-18-376(b)(3) of the Code of Alabama. For years four (4) through ten (10) the Investment Credit shall not be transferable.

If the Company is a flow-through entity, the Company may allocate the Investment Credit among some or all of the owners of the Company pursuant to section 40-18-376(b)(2) of the Code of Alabama. Owners of the flow-through entity who are individuals may utilize the Investment Credit to offset individual income tax or estimated income tax payments but shall not use the Investment Credit to offset utility gross receipts tax.

(b)     **Jobs Credit.**   The Company shall be eligible to receive a Jobs Credit in the annual amount of four percent (4.00%) of Wages paid during a Reporting Year to Alabama resident Project Employees occupying Project Jobs, up to one hundred ten percent (110.00%) of the Jobs Target. The Jobs Credit shall be available for a period of ten (10) consecutive Reporting Years and shall commence no later than the date set forth in Subsection 2(b) of the Project Schedule. The Jobs Credit shall be granted in keeping with and subject to

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

the provisions pursuant to section 40-18-370, *et seq.,* of the Code of Alabama.

Further, pursuant to section 40-18-376.2 of the Code of Alabama, for every Reporting Year in which Veterans are at least twelve percent (12.00%) of the Project Employees, the Company shall be eligible to receive an additional one-half of one percent (0.50%) refund on the Wages paid to Project Employees who are Veterans. For purposes of this Agreement, "Veteran" shall mean a veteran of the United States Armed Forces who received an honorable or general discharge.

(c)     **AIDT.**     Through Alabama Industrial Development Training Institute (AIDT), the State shall provide the assistance described in the commitment letter attached hereto as Exhibit B.

5.     **Annual Compliance.**     The Company acknowledges that the Company's right to Jobs Act Incentives offered by the State is contingent upon annual reporting to confirm compliance with the Capital Investment Target, Jobs Target and Minimum Average Hourly Wage requirements as set forth in this Agreement. Annual compliance is required during each Reporting Year of the Incentive Period and Maintenance Period.

(a)     Not later than forty-five (45) days following Commencement of Operations, the Company shall notify the Secretary, using the form attached hereto as Exhibit C. This form shall also notify the Secretary of the Company's election to commence the Incentive Period. The Company's elections for commencement of the Incentive Period are not binding and can be modified in accordance with the terms of this Agreement.

(b)     Not later than forty-five (45) days following the last day of each Reporting

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

15

Year and at such other times as the State may request, the Company shall furnish to the Secretary a certificate, certified as to the accuracy of the facts stated therein by an authorized officer of the Company, certifying:

    i. The amount of the Wages paid to each Project Employee for each Reporting Year;

    ii. The number of hours worked by each Project Employee for each Reporting Year;

    iii. Data for each Project Employee including, but not limited to: unique employee identification number, state of residence, veteran status, job title or classification, type of employee, eligibility for Fringe Benefits, hire and termination dates; and

    iv. The direct and indirect Capital Investment in the Project for each Reporting Year prior to the Capital Investment Target Date. The Company's certification of its direct Capital Investment shall be supported by a third-party Certification of Capital Investment substantially in the form attached hereto as Exhibit D. If no new Capital Investment was made in a Reporting Year, the certification under this Subsection 5(b)(iv) is not required.

(c) The Company shall have ninety (90) days from the earlier of (i) the date the Company submits its annual compliance certificate or (ii) the annual compliance certificate due date to work in good faith with Commerce to facilitate, to Commerce's satisfaction, completion of such certificate within this time. If the Company fails to finalize such certificate, to Commerce's satisfaction, the certificate shall be deemed non-compliant.

(d) Once Commerce determines the Company satisfied its obligations under this Agreement, Jobs Act Incentives shall be issued by Revenue, in accordance with procedures set by Revenue.

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

(e) The State may require the Company to provide such other documentation permitted under section 40-18-370, *et seq.*, of the Code of Alabama or which the State deems necessary to confirm the Company's certification.

6. **Disqualification of Jobs Act Incentives.** The Company acknowledges that Jobs Act Incentives offered by the State are based, in part, on the estimated economic impact that will be realized from the Capital Investment incurred in the Project and additional payroll and jobs created for the Project, and that those benefits are justified only if the Company fulfills its commitments as described in this Agreement. In consideration thereof, the Company agrees to the following provisions for disqualification of the Company's right to receive Jobs Act Incentives:

(a) **Temporary Disqualification**. The Company is temporarily disqualified from and forfeits Jobs Act Incentives for any Reporting Year during the Incentive Period in which the Company fails to:

 i. Complete its annual compliance report, pursuant to Subsection 5(c) of this Agreement; or

 ii. Maintain:

  1. Sufficient Project Jobs to meet a Yearly Average at least equal to the Minimum Jobs Threshold during the Project Ramp-Up Period;

  2. Sufficient Project Jobs to meet a Yearly Average at least equal to the Jobs Target after the Jobs Target Date; or

  3. The Minimum Average Hourly Wage.

(b) **Permanent Disqualification**. The Company is permanently disqualified from and forfeits all remaining Jobs Act Incentives during the Incentive Period in which the Company:

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

    i. Remains disqualified from receiving Jobs Act Incentives for three (3) consecutive Reporting Years, pursuant to Subsection 6(a) of this Agreement; or

    ii. Fails to meet a Yearly Average at least equal to forty percent (40.00%) of the Jobs Target for any Reporting Year after the Jobs Target Date.

In the event of permanent disqualification under this subsection, the Incentive Period shall end, and the Company shall be subject to recapture pursuant to Section 7.

7. **Recapture of Jobs Act Incentives.** The Company agrees to the following provisions for recapture of Jobs Act Incentives:

(a)    The Company is subject to recapture for any Reporting Year during the Maintenance Period in which the Company fails to:

    i. Complete its annual compliance report pursuant to Subsection 5(c) of this Agreement; or

    ii. Maintain:

        1. Sufficient Project Jobs to meet a Yearly Average at least equal to the Jobs Target; and

        2. The Minimum Average Hourly Wage.

(b)    In the event of recapture under Subsection 7(a), the Company shall pay to the State an amount equal to the Recapture Base multiplied by the greater of:

    [(the Jobs Target) less (the Yearly Average during such Recapture Year)] divided by (the Jobs Target);

or

    [(the Minimum Average Hourly Wage) less (the Actual Average Hourly Wage during such Recapture Year)] divided by the Minimum Average Hourly Wage.

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

In addition, any carried forward Investment Credits available as of a Recapture Year shall be reduced by the same proportion used to calculate the recapture fee in this Subsection.

(c)     The recapture fee for any Recapture Year shall be reduced by any amount paid to the State pursuant to this Section in any prior Recapture Year.

(d)     Any recapture amount due pursuant to this Section shall be paid to the State by the Company within thirty (30) days after the Company receives written demand from the State.

(e)     Notwithstanding anything contained in this Agreement to the contrary, the maximum recapture amount of Jobs Act Incentives that the State may recover from the Company are Jobs Act Incentives that have been:

  i.   Claimed by the Company as credits against its Alabama tax liability as provided in Subsection 4(a) of this Agreement; and

  ii.  Purchased from and transferred by the Company as provided in Subsection 4(a) of this Agreement; and

  iii. Received by the Company as refunds as provided in Subsection 4(b) of this Agreement.

(f)     The right of the State to recapture Jobs Act Incentives shall survive termination of this Agreement.

8.  **Grounds for Termination of the Obligations of the State.** The State or the Secretary may terminate this Agreement and all its obligations hereunder upon the occurrence of any of the following events:

(a)     Failure of the Company to Commence Construction by the date set forth in

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

19

Subsection 1(a) of the Project Schedule or Commence Operations by the date set forth in Subsection 1(b) of the Project Schedule.

(b)    Failure of the Company to meet the Jobs Target by the Jobs Target Date.

(c)    Failure of the Company to file any form, certificate, or other documentation required by the terms of this Agreement; provided, however, that the State shall provide thirty (30) days written notice to the Company of default and an opportunity to cure before terminating.

(d)    Failure of the Company to timely pay all amounts required under Section 6 of this Agreement as a result of the Company's failure to maintain any jobs or wage target as required by the terms of this Agreement.

(e)    A Change of Control of the Company that occurs in violation of Subsection 3(m), before expiration of the Maintenance Period.

(f)    The determination by the State that any representations made by the Company or its agents to induce the State or any agency or subdivision thereof to offer Jobs Act Incentives to the Company are not true in any material respect.

(g)    Failure of the Company to fulfill any other material obligation of this Agreement.

(h)    The Company's filing of bankruptcy, reorganization, liquidation, or receivership proceedings, or upon an assignment of a substantial portion of the assets for the benefit of creditors.

(i)    The Company violates any applicable federal or Alabama laws, at any time

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

20

during the term of this Agreement. This includes, but is not limited to, violations of child labor laws or any other statutes, regulations, or ordinances governing the Company's operations.

Should the State exercise its right to terminate as described in this Section 8, all Jobs Act Incentive funds paid, credited, or refunded by the State to the Company under Section 4 of this Agreement shall be immediately due and payable by the Company to the State and any carried forward Investment Credits shall be disallowed.

The State reserves all rights and claims it may have against the Company, whether arising under the terms of this Agreement or under Alabama law and reserves the right to pursue any such rights or claims against the Company.

9. **Costs and Expenses.** Each Party agrees to pay its own costs and expenses incurred in connection with the proposals, responses, and negotiation of the transactions contemplated in this Agreement, including all costs and expenses incurred in connection with the preparation of any studies or reports, surveys, or approvals for this Agreement or otherwise.

10. **Assignment.** Absent the consent of the Secretary, which shall not be withheld unreasonably, this Agreement is not assignable, except that the Company shall have the right at any time to assign all its rights and obligations in and to the Project and to assign this Agreement or any part thereof to any financially solvent affiliate of the Company that agrees to assume the assigned obligations of the Company in and to the Project. In the event of an assignment to any financially solvent affiliate of the Company, the Company must provide written notice to the State of such assignment within thirty (30) days of the assignment. If so assigned, the Company shall continue to be responsible for the performance of the obligations of the assignee under this Agreement unless specifically excused therefrom by the

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

21

Secretary, to be expressed in writing and signed by an authorized representative of the Secretary.

11. **Section Titles and Headings.**  The section titles and headings are for convenience only and do not define, modify, or limit any of the terms and provisions hereof.

12. **Survival of Representations and Warranties.**  The representations, warranties, and covenants made by each of the Parties in this Agreement shall survive the performance of any obligations to which such representations, warranties, and covenants relate.

13. **Waivers.**  Waiver of any of the obligations of any Party under this Agreement will be effective only when stated in writing and signed by the waiving Party. No delay or omission to exercise any right or power by any Party shall be construed to be a waiver. If any provision is waived by a Party, such waiver shall not be deemed to waive any other provision. To the extent that any Party's performance is subject to any regulatory or governing body approvals, that Party or those Parties shall have no obligation to perform and shall not be liable for non-performance, unless and until such regulatory or governing body approves or authorizes such performance, or such approval of the qualified electors is obtained. In such instance, all Parties affected shall use their best reasonable efforts to secure such approval or authorization.

14. **Time is of the Essence.**  The Parties acknowledge and agree that time is of the essence in the performance of their respective duties under this Agreement.

15. **Notices.**  All notices required by or related to this Agreement shall be sent by United States Mail, first class postage affixed, addressed to the receiving Party as described below:

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

22

**To the State of Alabama:**

> The Governor of the State of Alabama
> State Capitol
> 600 Dexter Avenue
> Montgomery, Alabama 36130

With a copy to:

> Finance Director
> State Capitol; Room N-200
> 600 Dexter Avenue
> Montgomery, Alabama 36104

And a copy to:

> Commissioner of Revenue
> 50 North Ripley Street
> Suite 4112
> Montgomery, Alabama 36132
> Email: incentives@revenue.alabama.gov

And a copy to:

> Secretary of Commerce
> 401 Adams Avenue
> Suite 670
> Montgomery, Alabama 36104
> Email: incentives@commerce.alabama.gov

**To the Company:**

> Coldchain Technology Services, LLC
> 244 Flightline Drive
> Spring Branch, TX 78070
> Attn: Wayne D. Williams
> Email: wwilliams@coldchain-tech.com

or to such other address as the receiving Party has most recently forwarded to the sending Party pursuant to the provisions of this Section.

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

16. **<u>Indemnification</u>.** The Company shall release, defend, save, hold harmless, and indemnify the State, its elected officials, officers, employees, and agents (collectively, the "Indemnified Parties") from and against any and all claims, costs, fees and expenses of whatever nature arising from the performance or nonperformance by the Company of any obligation in this Agreement, or arising from or in connection with an act or omission of the Company or any of the Company's agents, contractors, employees, or any other party for whom the Company is responsible in connection with the Project, including, but not limited to, all costs, attorney fees, expenses, and liabilities incurred in the defense of any such claim or any action against the Indemnified Parties, or any of them individually, by reason of any such claim, and the Company, upon notice from the State, shall defend the same at the Company's expense by counsel selected by the State. The foregoing indemnity obligation shall include, but is not limited to, indemnification of the Indemnified Parties against any claim for payment brought by any contractor, subcontractor, materialman, supplier, laborer, design professional, or the like in connection with work, labor, or materials supplied in connection with the improvements of the Project. The foregoing indemnity obligation shall survive the expiration or termination of this Agreement.

17. **<u>Amendment</u>.** This Agreement may be amended only by a written modification executed by each of the Parties' duly authorized representatives.

18. **<u>Governing Law</u>.** The governing law of this Agreement shall be the law of the State of Alabama, without regard to conflicts of law provisions. Without waiving sovereign immunity, the Parties agree that in the event of any dispute between the Parties, senior officials of both Parties shall meet and engage in a good faith attempt to resolve the dispute. Should that effort fail, and the dispute involves the payment of money, a party's sole remedy is the filing of a claim with the Board of Adjustment of the State of Alabama. For any and all other disputes arising under the terms of this Agreement which are not resolved by negotiation, the Parties agree

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

to utilize appropriate forms of non-binding alternative dispute resolution including, but not limited to, mediation. Such dispute resolution shall occur in Montgomery, Alabama, utilizing where appropriate, mediators selected from the roster of mediators maintained by the Center for Dispute Resolution of the Alabama State Bar.

**WHEREFORE,** the Parties hereto, intending to be legally bound by the provisions set forth in this Agreement, have caused this Agreement to be signed and delivered by their duly authorized representatives.

**COLDCHAIN TECHNOLOGY SERVICES, LLC**

By: *Wayne D. Williams*
Wayne D. Williams (Dec 7, 2025 09:24:01 PST)

Date: 12/07/2025

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

25

**STATE OF ALABAMA**


By: _____
 Kay Ivey, Governor


Effective Date: _____


COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

26

**EXHIBIT A**
# COLDCHAIN TECHNOLOGY SERVICES, LLC
# PROJECT SUMMIT
# PROJECT SCHEDULE

1. **PROJECT TARGET DATES:**

   a.  Commencement of Construction:          January 15, 2026

   b.  Commencement of Operations:            May 01, 2026

   c.  Capital Investment Target Date:        March 01, 2026

   d.  Jobs Target Date:                      December 31, 2027

2. **DEADLINE TO START FIRST REPORTING YEAR:**

   a.  Investment Credit:                     April 1, 2026

   b.  Jobs Credit:                           April 1, 2028

Any change to the Project Schedule occurring after the Effective Date shall require approval by the Secretary. Any such approved Project Schedule change shall be acknowledged in writing by the Company and the Secretary.

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

# EXHIBIT B

# AIDT LETTER

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

28



334.280.4400

one technology court
montgomery, al USA 36116-3200

www.aidt.edu





October 14, 2025

Mr. Alex Cate
Senior Project Manager
Alabama Dept. of Commerce
401 Adams Avenue
Montgomery, Alabama 36130-4106

Dear Mr. Cate:

Thank you for the opportunity to offer AIDT services and resources to assist Project Summit, as you consider Alabama for a new project location.  AIDT is a job-specific training incentive program, for new and expanding projects, designed to develop a customized training plan and process for recruitment, screening and training new employees.  In addition to the training reimbursements, AIDT offers in-kind services, which include: an assigned AIDT Project Manager, assistance with a Pre-Employment Selection System, Leadership Development, a fleet of Mobile Training Units for on-site use, Video Production services, Maintenance Assessments, Safety Assistance/Training, Robotic and PLC Automation Training, and other various services.

***AIDT commits the following Direct Cash Reimbursement, based on 51 new, full-time jobs created with a minimum starting wage of $15.00 per hour (not an average wage), plus benefits, for entry-level positions. If the project is in a target county, the entry-level wage is subject to change.  Training reimbursements are distributed after services have been rendered.***

**Post Hire / On-the-Job Training**                                                                    $24,480
To be used for trainer/instructor wages and expenses.

**Instructor Development**                                                                                    $12,240
Funds to be used to offset costs for instructional staff.
(Examples: expenses for travel, and vendor training)

                                                    Total Direct Cash Reimbursement          $36,720

In-kind value for AIDT usual and normal services related to the project as described above.

                                                    Total In-kind Value          $669,000

Total value for Direct Cash Reimbursements and In-kind services.                          **$705,720**

AIDT looks forward to meeting with Project Summit to further understand and determine employee and training needs, as we begin to work with you to develop a company-specific recruiting process and training program.  Please call with any additional questions or further clarification.

Sincerely,

Ed Castile
Executive Director

EC/BJD/sw




**EXHIBIT C**

**FORM COMP-1**

**COMPLIANCE PORTAL ENROLLMENT**

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

29



10/24

# ALABAMA DEPARTMENT OF COMMERCE

ALABAMA JOBS ACT
Code of Alabama § 40-18-370, et seq.

**COMPLIANCE PORTAL ENROLLMENT
FORM COMP-1**

## Incentivized Company Information

Company Name:        _____

Project Address:        _____

Contact Name:        _____        Job Title:        _____

Contact Info:        Telephone:        _____        Email:        _____

FEIN:        _____

## Compliance Portal User Information

Company Name:        _____

Contact Name:        _____        Job Title:        _____

Contact Info:        Telephone:        _____        Email:        _____

## Company Name Change or Change of Control

Since the Effective Date of the agreement:

1.  Has the incentivized company had a name change?        Yes ☐        No ☐

    If yes, what is the new name of the incentivized company?        _____

2.  Has the incentivized company had a change of control?        Yes ☐        No ☐

## Project Information

Commencement of Construction Date:        _____

Project Placed-in-Service Date:        _____

Commencement of Operations Date:        _____

## Minimum Jobs Threshold

Date Minimum Jobs Threshold was met:        _____

Number of Full-Time Employees created to-date
by the Project:        _____

Return the completed and executed form to:
incentives@commerce.alabama.gov



10/24

**Company Tax Year**

First Day of Tax Year:   _____        Last Day of Tax Year:   _____

**Commencement of Incentive Period**

1. The Incentive Period cannot commence prior to the date the Minimum Jobs Threshold was met.

2. The first day of the first Reporting Year for the Jobs Credit and Investment Credit may occur in different years, pursuant to the project agreement, but must occur on the same calendar quarter date.

3. Please elect the calendar quarter start date for the company's incentive period as well as the year in which each credit shall commence. If the company opts to delay, in accordance with the project agreement, the year in which either credit shall commence, denote "TBD."  The Company's elections for commencement of the Incentive Period are not binding and can be modified in accordance with the terms of the Project Agreement.

4. If the project agreement allows for only one of the credits, disregard language pertaining to the unauthorized credit.

**Calendar Quarter Start Date for Reporting Year** (applicable to both credits)

April 1    ◯        July 1    ◯        October 1    ◯

**Starting Year for Credits** (each credit separately)

Jobs Credit              20_____    or    TBD _____
Investment Credit        20_____    or    TBD _____

**Certification**

As an authorized representative for the Company, I hereby certify that all information reported herein is true and correct to the best of my knowledge and belief. I understand that willful making of false statements of material fact herein will subject me to the provisions of law relevant to the making and filing of false instruments and will cause this report to be rendered null and void.

Signature of Signatory:          _____

Printed Name of Signatory:      _____

Title of Signatory:              _____

Date:                            _____

Return the completed and executed form to:
incentives@commerce.alabama.gov

Page 2 of 2

**EXHIBIT D**

**THIRD PARTY CAPITAL INVESTMENT CERTIFICATION**

**[TO BE INSERTED ON CPA LETTERHEAD]**

COLDCHAIN TECHNOLOGY SERVICES, LLC
PROJECT SUMMIT

30

**INDEPENDENT ACCOUNTANTS' REPORT ON
APPLYING AGREED-UPON PROCEDURES**

We have performed the below described procedures (the "Agreed Upon Procedures") to inspect the accounting records of _____ (the "Company") related to the Capital Investment in Project Summit (the "Project"). These procedures were agreed upon by the Company and the Alabama Department of Commerce ("Commerce") for the required review of the Company's accounting records in connection with the Project. The Company's management is responsible for the Company's accounting records and has represented to us that the Company's accounting records are accurate. The sufficiency of these procedures is solely the responsibility of the Company and Commerce. We make no representation regarding the sufficiency of the procedures described below either for the purpose for which this report has been requested or for any other purpose. This Agreed Upon Procedures engagement was conducted in accordance with attestation standards established by the American Institute of Certified Public Accountants.

The Project is defined as follows: the purchasing and equipping of an existing facility located at 302 Bibb Street in Marion, Perry County, Alabama, wherein the Company will establish a Center of Excellence that includes a cutting-edge national and international medical and technical research, development, initial product production and global logistics hub focused on the pharmaceutical and technology industries.

We have been provided with schedules of the Capital Investment in the Project by the Company amounting to $_____ (see the attached schedules of costs) and have been informed that these amounts have been expended on the Project. "Capital Investment" is defined as all costs and expenses incurred by the Company in connection with the acquisition, construction, installation and equipping of the Project, which are required to be capitalized for purposes of the federal income tax, determined without regard to any rule that permits expenditures properly chargeable to a capital account to be treated as current expenditures. To the extent that the Project involves the extraction of natural resources, the capital investment shall not include the costs of acquiring land, land recording fees, architectural and engineering services, environmental studies and environmental

mitigation.

Our procedures and findings relating to the accompanying schedules were as follows:

1.      We recalculated the arithmetic accuracy of the schedules; no exceptions noted.

2.      We inspected a sample[1] of invoices and expenditures noting that the purchases and associated work performed was related to the Project and documented that the expenditures included in the reported Capital Investment met the definition of Capital Investment set forth above; no exceptions noted.

3.      The earliest Capital Investment in the Project included in the schedule noted above occurred on or about _____ and the last Capital Investment occurred on or about _____ .

This report is intended solely for the information and use by the Company and to inspect (on a test basis) the accuracy of the information stated above concerning Capital Investment in the Project, and is not intended to be, and should not be, used by anyone other than the specified parties.  Further, the results of the Agreed Upon Procedures will be provided to Commerce and we are aware that it will be relied upon by Commerce for purposes of satisfying the requirements of the Project under Section 40-18-376 of the Code of Alabama.

We were not engaged to, and did not, conduct an audit, the objective of which would be the expression of an opinion on the accounting records. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

Very truly yours,

Firm:    _____

By:      _____
Title:    _____
Date:    _____

---

[1] "Sample" is defined as (1) at least 10 invoices, and (2) invoices aggregating to at least 15% of the total Capital Investment in the Project.

# Project Summit-EXECUTION COPY

Final Audit Report                                                          2025-12-07

| | |
|---|---|
| Created: | 2025-12-05 |
| By: | Lauren Rowland (Lauren.Rowland@commerce.alabama.gov) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAlBbvyKQ3fdaelYVTuEebTqknI5cwPlW1 |

## "Project Summit-EXECUTION COPY" History

Document created by Lauren Rowland (Lauren.Rowland@commerce.alabama.gov)
2025-12-05 - 8:51:08 PM GMT- IP address: 216.226.188.38

Document emailed to wwilliams@callanjmb.com for signature
2025-12-05 - 8:53:34 PM GMT

Email viewed by wwilliams@callanjmb.com
2025-12-06 - 1:09:05 AM GMT- IP address: 174.221.172.244

Signer wwilliams@callanjmb.com entered name at signing as Wayne D. Williams
2025-12-07 - 5:23:59 PM GMT- IP address: 76.88.36.219

Document e-signed by Wayne D. Williams (wwilliams@callanjmb.com)
Signature Date: 2025-12-07 - 5:24:01 PM GMT - Time Source: server- IP address: 76.88.36.219

Agreement completed.
2025-12-07 - 5:24:01 PM GMT



State of Alabama    Powered by Adobe Acrobat Sign